# MOTION TO INTERVENE

## IN THE UNITED STATES DISTRICT COURT FOR

## THE EASTERN DISTRICT OF PENNSYLVANIA

**CIVIL ACTION NO. 5:24-CV-01435**

MICHAEL K. MADIGAN, Proposed Intervenor and Movant.

v.

LISA L. TRESSLAR, Plaintiff,

v.

NORTHAMPTON COUNTY COURT OF COMMON PLEAS, et al.,
Defendants.

## MOTION TO INTERVENE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 24

## TO THE HONORABLE JUDGE JOHN M. GALLAGHER
## OF THE UNITED STATES DISTRICT COURT:

Pursuant to Federal Rule of Civil Procedure 24(a) and (b), Proposed

Intervenor, Michael K. Madigan, respectfully moves this Court for leave to

intervene as a matter of right or, in the alternative, permissively intervene in

the above-captioned matter.

Intervention is necessary due to the deprivation of discovery, delays in adjudication, and substantive issues directly overlapping with those presented in Plaintiff Tresslar's claims. Proposed Intervenor is a direct victim of unconstitutional and retaliatory misconduct within the Northampton County Court of Common Pleas—including actions by Plaintiff Tresslar in her capacity as Custody Master.

## I. INTRODUCTION

1. Proposed Intervenor, Michael K. Madigan, is a litigant in a related legal matter involving judicial misconduct, obstruction of justice, and due process violations within the Northampton County Court of Common Pleas In the Commonwealth Court at 527 MD 2023 *Michael Madigan v, Northampton County SD, et al* **and** Commonwealth Court 554 MD 2024 Michael *Madigan,M v. Baratta,S. and Lisa Tresslar, Esq., et al.*

2. Plaintiff Lisa L. Tresslar, in her Complaint, alleges that she was subjected to discriminatory and retaliatory practices that ultimately led to her constructive discharge from the Northampton County Court.

3. Proposed Intervenor contends that Tresslar, during her tenure as Custody Master, was an active participant in the very same judicial abuses that she now claims victimized her.

4. Intervenor's interest in this case is both direct and substantial, as the systemic misconduct he has suffered is closely aligned with Tresslar's allegations against the Northampton County Court.

5. The outcome of this case will affect Proposed Intervenor's ability to obtain justice in his own legal matters, as well as expose judicial misconduct within the Northampton County Court that deprived him of his constitutional rights.

## II. LEGAL STANDARD FOR INTERVENTION

6. Federal Rule of Civil Procedure 24(a)(2) provides for intervention as of right when:

   - (1) The movant has a significant interest in the litigation.

   - (2) The resolution of the case may impair or impede the movant's ability to protect their interest.

   - (3) The movant's interest is not adequately represented by the existing parties.

7. Alternatively, under Rule 24(b)(1)(B), permissive intervention may be granted where the movant shares a question of law or fact with the main action and intervention would not cause undue delay or prejudice.

## III. BASIS FOR INTERVENTION AS OF RIGHT

8. Proposed Intervenor's claims share a common legal nexus with Plaintiff Tresslar's allegations against the Northampton County Court of Common Pleas, particularly as they pertain to:

  - Retaliatory conduct within the judiciary.

  - Suppression of discovery and obstruction of justice.

  - Systemic due process and equal protection violations.

9. Proposed Intervenor has been denied discovery in his own ongoing legal matters, and the delays and suppression of information directly mirror the retaliatory practices alleged by Plaintiff Tresslar.

10. Tresslar, while employed as Custody Master, actively participated in the same constitutional violations that she now claims to have been subjected to.

11. The Court's findings in this case will have a direct and substantial impact on Proposed Intervenor's ability to obtain relief in his pending and future claims.

12. No existing party in this litigation adequately represents Intervenor's interests.

## IV. BASIS FOR PERMISSIVE INTERVENTION

13. Permissive intervention is also appropriate under Rule 24(b), as the legal and factual issues in this case are substantially identical to those in Proposed Intervenor's pending legal matters.

14. Granting intervention will not unduly delay these proceedings, nor will it prejudice any party. Rather, it will assist the Court in fully understanding the extent of judicial misconduct and systemic issues within the Northampton County Court.

## V. STATEMENT OF INTEREST OF MOVANT-INTERVENOR

In support of this Motion, Movant states as follows:

15. Direct, Substantial, and Legally Protectable Interest

• Movant has a direct and personal stake in the outcome of this case, which raises constitutional questions related to due process, equal protection, and judicial accountability in Pennsylvania courts.

16. Experience with Systemic Judicial Misconduct

• Movant has been directly affected by fabricated custody records, obstruction of justice, and retaliatory rulings within the Pennsylvania judicial system.

• The misconduct at issue in this case mirrors broader unconstitutional practices that have deprived Movant of fundamental parental and due process rights.

17. No Adequate Representation by Existing Parties

• The current litigants do not fully represent Movant's interests, particularly in exposing and remedying systemic due process violations and judicial bias.

• Movant's participation is necessary to provide additional legal arguments, documentary evidence, and factual background that may not be presented by the existing parties.

18. Legal Basis for Intervention

• Under Rule 24(a)(2) (Intervention as of Right), Movant has a substantial interest in the litigation that would be impaired if intervention is denied.

• Alternatively, under Rule 24(b) (Permissive Intervention), Movant presents common legal and factual issues that warrant intervention in the interest of justice.

## VI. OPPOSITION TO DENIAL OF DISCOVERY

19. Denial of Discovery Obstructs Access to Critical Evidence

• Respondents have moved to block discovery in an effort to conceal records that may demonstrate procedural irregularities, judicial bias, and systemic corruption.

• The Supreme Court has recognized that discovery is essential in civil rights and constitutional litigation where government misconduct is alleged. See *Mitchell v. Forsyth, 472 U.S. 511 (1985).*

20. Judicial and Sovereign Immunity Do Not Justify Withholding Evidence

• Courts have routinely held that judicial immunity does not protect non-judicial or administrative acts, including tampering with records and procedural fraud. See *Forrester v. White, 484 U.S. 219 (1988); Stump v. Sparkman, 435 U.S. 349 (1978).*

• Similarly, sovereign immunity is inapplicable where constitutional violations are at issue. See Ex parte Young, 209 U.S. 123 (1908).

21. **Public Interest Demands Transparency**

• The Pennsylvania judiciary has a documented history of corruption, including:

**PENNSYLVANIA'S "DIRTY DOZEN" JUDICIAL CORRUPTION CASES: AOPC'S WALL OF PROTECTION FOR THE WORST JUDGES IN THE STATE**

22. For decades, the Administrative Office of Pennsylvania Courts (AOPC) has functioned as a judicial shield—not for the innocent, but for the corrupt. When Pennsylvania judges engaged in bribery, case-fixing, child trafficking, sexual misconduct, election fraud, and even drug theft, AOPC looked the

other way. They ignored complaints, protected offenders, and only took action when media exposure or federal investigations forced their hand.

The Dirty Dozen below represent the worst offenders in Pennsylvania's judiciary, with AOPC complicit in their cover-ups—until public outrage or criminal charges made their misconduct impossible to ignore.

## 1. "Kids for Cash" – Judges Michael Conahan & Mark Ciavarella (2008)

Crime: Selling children into for-profit detention centers for $2.8 million in kickbacks.

How AOPC Covered It Up: Ignored reports for years, failed to investigate financial irregularities, and allowed Ciavarella to run a "zero tolerance" court that rubber-stamped mass incarcerations of juveniles without legal representation.

Outcome: Conahan sentenced to 17 years, Ciavarella to 28 years—but only after the FBI intervened. Meanwhile, thousands of lives were ruined.

AOPC's Role: They were warned but did nothing.

## 2. Philadelphia Traffic Court Ticket-Fixing Scandal (2013)

Crime: Multiple judges conspired to dismiss or reduce traffic tickets for political allies, campaign donors, and personal friends.

How AOPC Covered It Up: Instead of investigating clear patterns of case manipulation, AOPC let corrupt judges operate unchecked for years.

Outcome: Only when the FBI raided the courthouse did the scandal come to light. Several judges were convicted, and Philadelphia Traffic Court was abolished in disgrace.

AOPC's Role: Acted shocked, but had ignored clear warning signs for years.

### 3. Justice Seamus McCaffery – "Porngate" & Ticket Fixing (2014)

Crime: Emailed 234 pornographic images and videos to state officials using his judicial email. Also tried to fix his wife's traffic ticket and allowed her to illegally collect legal referral fees. Justice Castille called him a "sociopath".

How AOPC Covered It Up: Dismissed initial complaints, calling them "personal matters," and only acted after Chief Justice Ronald Castille exposed the emails.

Outcome: McCaffery resigned in disgrace, but thanks to AOPC's protection, he kept his $134,000 taxpayer-funded pension.

AOPC's Role: They knew about the emails but didn't act until forced.

### 4. Justice J. Michael Eakin – The "John Smith" Racist & Pornographic Email Scandal (2016)

Crime: Used a fake alias ("John Smith") to send racist, misogynistic, and pornographic emails to state officials.

How AOPC Covered It Up: Dismissed complaints as "private conduct" until the emails became public.

Outcome: Eakin resigned to avoid removal but kept his pension.

AOPC's Role: Knew about the emails but only took action once McCaffery retaliated by leaking them.

## 5. Justice Joan Orie Melvin – Using Court Staff for Her Campaign (2013)

Crime: Forced court employees to work on her election campaign while being paid by taxpayers.

How AOPC Covered It Up: Ignored ethics complaints and didn't act until criminal charges were filed.

Outcome: Convicted of felony corruption, sentenced to house arrest, forced to apologize to every judge in Pennsylvania.

AOPC's Role: Could have investigated, but instead let her abuse taxpayer dollars unchecked.

## 6. Justice Mark B. Cohen – Partisan Judicial Corruption (2024)

Crime: Used official judicial accounts to post partisan political propaganda.

How AOPC Covered It Up: Ignored reports for months until national

media pressure forced action.

Outcome: Suspended without pay, but still receiving a taxpayer-funded pension.

AOPC's Role: Tried to protect him until the scandal was too big to hide.

## 7. Judge Anthony Saveikis – Child Exploitation & Abuse Allegations (2024)

Crime: Followed a 17-year-old bo into a walk-in freezer, engaged in "grooming" behavior with minors.

How AOPC Covered It Up: Dismissed early reports, allowing him to stay on the bench.

Outcome: Resigned in disgrace after public pressure made his position untenable.

AOPC's Role: Let a predator remain on the bench until exposure forced his resignation.

## 8. Judge Sonya McKnight – Two Attempted Murders (2024)

Crime: Shot her ex-boyfriend in the head while he slept, leaving him blind in one eye. Previously shot her ex-husband in the groin.

How AOPC Covered It Up: Allowed her to stay on the bench even after the first shooting.

Outcome: Finally suspended after the second shooting.

AOPC's Role: Ignored multiple red flags until national media forced action.

## 9. Judge Paul Pozonsky – Cocaine Theft from Court Evidence Lockers (2013)

Crime: Stole over 10 ounces of cocaine from police evidence rooms.

How AOPC Covered It Up: Allowed him to quietly retire instead of reporting him.

Outcome: Convicted, sentenced and spent just one weekend in jail.

AOPC's Role: Let a drug-addicted judge keep hearing cases until public exposure forced action.

## 10. Judge John DiSalle – Retaliation, Civil Rights Violations & AOPC Complicity (2025)

Crime: Fired a courthouse employee for exposing that his court was jailing veterans without access to legal counsel.

AOPC's Role:

- Knew about the retaliation but failed to act.

- Supported his actions instead of investigating.

- Only admitted wrongdoing after being sued in federal court.

Outcome: Facing a federal lawsuit alongside AOPC, the Unified Judicial System, and Court Administrator Grimm.

## 11. Judge Steven Stambaugh – 31-Count Federal Indictment (2025)

Crime: Indicted for wire fraud, mail fraud, witness tampering, and obstruction of justice.

How AOPC Covered It Up: Did nothing until the FBI intervened.

Outcome: Awaiting trial in federal court.

AOPC's Role: Let him keep hearing cases even while under investigation.

## 12. Judge Barry Feudale & Judge Thomas Nocella – The "Fraudulent Bench" Duo

Feudale's Crimes: Leaked sensitive grand jury materials, engaged in unethical communications with prosecutors.

Nocella's Crimes: Lied to judicial screening boards, engaged in financial fraud, and acted as a fixer for political operatives.

AOPC's Role:

- Failed to investigate Feudale's leaks until exposed by the media.

- Allowed Nocella to be seated as a judge despite knowledge of his corruption.

Outcome: Both removed, but only after their misconduct was too public to ignore.

• Given this pattern of misconduct, it is imperative that discovery not be denied or restricted.

23. **Alternative: Targeted Discovery if Full Discovery is Denied**

• If the Court is hesitant to allow full discovery, Movant requests limited discovery on:

• Complaints against custody officers, judges, and administrators for procedural misconduct.

• Internal audits and communications related to fabricated court summaries.

• Emails and memos discussing procedural changes affecting due process rights.

Petitioners Summaries in which Tresslar portrays him as homeless thus by defaming him and false claims of unfitness.

**VII. RELIEF REQUESTED**

WHEREFORE, Movant respectfully requests that this Honorable Court:

24. **GRANT** Movant's Motion to Intervene as a party with substantial and direct legal interests in the case.

25. **DENY** any motion to stay or block discovery that would prevent full transparency into judicial and administrative misconduct.

26. **ORDER** limited discovery, at a minimum, to obtain key records related to procedural violations, judicial bias, and due process violations.

27. **SCHEDULE** an evidentiary hearing to assess whether discovery is necessary to prevent concealment of evidence.

28. **GRANT** any further relief that this Court deems just and necessary in the interest of justice.

## VIII. PRO SE LITIGANT STATEMENT IN SUPPORT OF INTERVENTION UNDER ESTELLE v. GAMBLE, 429 U.S. 97 (1976)

29. NOW COMES Movant-Intervenor, Michael Madigan, acting pro se, and respectfully submits this statement in support of his Motion to Intervene and Opposition to Denial of Discovery, emphasizing the well-established leniency and special considerations afforded to pro se litigants as recognized by the United States Supreme Court in *Estelle v. Gamble, 429 U.S. 97* (1976) and its progeny.

### A.    LEGAL PRINCIPLES AFFORDED TO PRO SE LITIGANTS

**1. The Court Must Construe Pro Se Filings Liberally**

• The Supreme Court in *Estelle v. Gamble, 429 U.S. 97, 106 (1976)* held that pro se litigants' pleadings must be held to less stringent standards than those drafted by lawyers.

• This principle ensures that courts focus on substance rather than form when evaluating claims raised by non-lawyers.

**2. Substantial Compliance with Procedural Rules Should Be Sufficient**

• In *Haines v. Kerner, 404 U.S. 519, 520 (1972),* the Court reaffirmed that a pro se complaint, even if inartfully pleaded, must be viewed with leniency and given the benefit of doubt.

• Courts should ensure that technical deficiencies do not prevent meritorious claims from being heard.

**3. Pro Se Litigants Must Be Given an Opportunity to Present Their Claims**

• In *Erickson v. Pardus, 551 U.S. 89, 94 (2007),* the Supreme Court emphasized that dismissal of a pro se litigant's claims must not be based on overly technical reasoning or strict procedural adherence.

• This doctrine ensures that access to justice is not denied simply due to lack of legal training.

## 4. Federal Courts Must Allow Pro Se Litigants Reasonable Access to Evidence

• In *Bounds v. Smith, 430 U.S. 817 (1977),* the Court ruled that pro se litigants must be afforded meaningful access to the courts, including access to necessary discovery materials.

## B.    APPLICATION TO THIS CASE

30. Movant's Pro Se Status Warrants Leniency in Procedural Matters

• Movant, as a pro se litigant, lacks formal legal training but is actively pursuing constitutional relief in good faith.

• The Supreme Court's ruling in Estelle mandates that this Court interpret Movant's pleadings with flexibility and fairness.

31. The Court Should Not Deny Discovery Based on Procedural Technicalities

• Denying Movant discovery would unfairly prejudice his ability to substantiate his claims.

• Under *Bounds v. Smith*, discovery is an essential part of ensuring a fair and impartial legal process for pro se litigants.

32. Justice Requires That Pro Se Litigants Be Given Equal Consideration

• The Constitution does not distinguish between litigants represented by attorneys and those proceeding pro se.

• A denial of discovery or procedural rights due to Movant's pro se status would be fundamentally unfair.

## IX. RELIEF REQUESTED

33. WHEREFORE, Proposed Intervenor respectfully requests that this Court:

A. **Grant** intervention as of right pursuant to Fed. R. Civ. P. 24(a)(2); or

B. In the alternative, grant permissive intervention under Fed. R. Civ. P. 24(b);

C. **Allow** Proposed Intervenor full access to discovery relevant to this case and his related litigation;

D. **Permit** Proposed Intervenor to present evidence demonstrating the systemic judicial misconduct within the Northampton County Court of Common Pleas;

E. **Grant** any further relief that this Court deems just and appropriate.

**JURY TRIAL DEMANDED**

Respectfully submitted,

***s/ Michael Madigan***

Michael K. Madigan

Proposed Intervenor, Pro Se  517 Mckean Ave


Charleroi, PA 15022

Dated: 2/18/2025

# Motion to Intervene

# – U.S. District Court for the Eastern District of Pennsylvania

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL MADIGAN,

Movant-Intervenor,

v.

LISA L. TRESSLAR, Plaintiff,

v.

NORTHAMPTON COUNTY COURT OF COMMON PLEAS, et al.,
Defendants CIVIL ACTION NO. 5:24-CV-01435

## STATEMENT OF VERACITY

I, Michael Madigan, hereby affirm under penalty of perjury pursuant to 28 U.S.C. § 1746 that the statements, allegations, and factual contentions contained in my Motion to Intervene and all supporting filings in the above-captioned matter are true and correct to the best of my knowledge, information, and belief.

I further declare that:

1. My legal interest in the case arises from Lisa Tresslar's Statement proving movant was denied due process:
   "Most of those cases were so well prepared, and so thoroughly documented in my written case summaries, that the judges were able to settle them without conducting a trial, eliminating the need for generating expensive transcripts and performing time-consuming analyses and written judicial opinions. In short, the new system,

which Judge Baratta envisioned and I designed and implemented, ran beautifully."

2. My Motion to Intervene is made in good faith, in accordance with Rule 24 of the Federal Rules of Civil Procedure, and is not intended to cause undue delay or disrupt the orderly administration of justice.

3. Any exhibits, supporting documents, or legal authorities cited are submitted with the utmost integrity and are presented solely in pursuit of truth and justice.

4. I understand that false statements in this declaration are subject to penalties under 18 U.S.C. § 1001 and may result in criminal prosecution.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on: 2/18/2025

Respectfully submitted,

*s/ Michael Madigan*

Michael Madigan

Pro Se Movant-Intervenor

517 McKean Avenue

Charleroi, PA 15022

snailsandquails@gmail.com

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL MADIGAN,

Movant-Intervenor,

v.

LISA L. TRESSLAR, Plaintiff,

v.

NORTHAMPTON COUNTY COURT OF COMMON PLEAS, et al.,
Defendants

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing

## MOTION TO INTERVENE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 24

has been served via email and first-class mail on this February 18, 2025 to:

**Gerard Geiger, Esq**. Newman and Williams PC -Attorney for Lisa Tresslar

712 Monroe Street Stroudsburg, PA 18360
Email: GThreats@newmanwilliams.com GGieger@newmanwilliams.com

**Sonia Kivisto, Esq.** Legal Department Administrative Office of Pennsylvania Courts 1515 Market Street, Suite 1414 Philadelphia, PA 19102
Email: legaldepartment@pacourts.us -Attorney for judicial defendants

**Sidney Gold**, **Esq.** 1835 Market Street, Suite 515
Philadelphia, Pennsylvania 19103 -Attorney for Lisa Tresslar

Email: sgold@discrimlaw.net

**Michael Daley Esq**. Legal Department Administrative Office of Pennsylvania Courts 1515 Market Street, Suite 1414 Philadelphia, PA 19102 Email: legaldepartment@pacourts.us -Attorney for judicial defendants

**Jennifer Hope. Esq**. Legal Department Administrative Office of Pennsylvania Courts 1515 Market Street, Suite 1414 Philadelphia, PA 19102 Email: legaldepartment@pacourts.us -Attorney for judicial defendants

Respectfully submitted,

*s/ Michael Madigan*

Michael Madigan

Pro Se Movant-Intervenor

517 McKean Avenue

Charleroi, PA 15022

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL MADIGAN,

Movant-Intervenor,

v.

LISA L. TRESSLAR, Plaintiff,

v.

NORTHAMPTON COUNTY COURT OF COMMON PLEAS, et al.,
Defendants

### CIVIL ACTION NO. 5:24-CV-01435

### [PROPOSED] ORDER

AND NOW, this ___ day of _____, 2025, upon consideration of Movant-Intervenor Michael Madigan's Motion to Intervene and Opposition to Denial of Discovery, and any responses thereto, it is hereby ORDERED and DECREED as follows:

1. Movant's Motion to Intervene is GRANTED.

• The Court finds that Movant-Intervenor has a direct and substantial interest in the subject matter of this case pursuant to Rule 24(a) (Intervention as of Right) and Rule 24(b) (Permissive Intervention) of the Federal Rules of Civil Procedure.

2. Respondents' Motion to Stay or Deny Discovery is DENIED.

• The Court finds that discovery is necessary and appropriate given the allegations of constitutional violations, due process deprivations, and judicial misconduct.

3. Respondents SHALL comply with discovery obligations as follows:

• Within fourteen (14) days of this Order, Respondents shall produce:

a. All custody case records and related complaints involving the alleged procedural violations.

b. Internal emails, audits, and communications discussing fabricated custody reports.

c. Any relevant documents or correspondence regarding procedural changes affecting due process rights.

4. In the alternative, the Court ORDERS limited discovery as follows:

• Respondents shall produce non-privileged administrative records, communications, and internal audits relevant to Movant's allegations within 30 days of this Order.

5. An evidentiary hearing is scheduled for the ____ day of _____, 2025, at _____ AM/PM in Courtroom ____ of the United States District Court for the Eastern District of Pennsylvania, at which the Court will hear arguments regarding:

• The scope of necessary discovery and any remaining disputes regarding document production.

• Whether further intervention by the Court is needed to ensure compliance with due process and transparency requirements.

6. Any failure to comply with this Order may result in sanctions, including but not limited to adverse inferences, monetary penalties, or other appropriate relief as deemed necessary by the Court.


IT IS SO ORDERED.


BY THE COURT:


UNITED STATES DISTRICT JUDGE

# Exhibit A

STATEMENT by CUSTODY MASTER Lisa Tresslar:

I am writing to submit my resignation as custody master. In numerous previous memoranda, I have detailed harassing and bullying behavior by Judge Jennifer R. Sletvold, Judge Paula A. Roscioli, and Court Administrator J. Jermaine Greene, Sr. The three of them are demonstrably motivated by age and sex discrimination. They are threatened by, and hostile toward, any woman who is talented, hardworking, and has earned the respect of judges, attorneys, and other opinion leaders in the community. They have created a hostile work environment in the courthouse, not only for me but for many other older women. Although I have never done anything to any of them, they have been so threatened by me that they have become obsessed with destroying me. They have been trying to drive me out of the courthouse for the past five years. They have waged an unrelenting campaign to limit my role and destroy my value to the court. They have defamed me, publicly humiliated me, and made every effort to make me appear incompetent. Because I stood my ground, and because they could not persuade the two past President Judges to fire me, they began actively sabotaging the Custody Division, hoping to destroy its magnificent operations and use that as a basis for saying I had lost my effectiveness. When you became President Judge five months ago, in May 2023, you immediately endorsed their agenda, adopted the new custody procedures they had requested, and placed Mr. Greene in charge of all administrative functions of the Custody Division, demoting me into oblivion. Mr. Greene has now deliberately plunged the Custody Division into complete disarray. He has violated our longstanding procedures and even the procedures you yourself recently adopted. If he is allowed to continue, the court will soon be in violation of the State Rules of Civil Procedure, and the custody

court will no longer be a realistic resource for the children and families of Northampton County.

I have worked for almost forty years to develop my professional expertise and establish relationships with judges and attorneys. I cannot allow these people to inflict further damage on my professional reputation. My working conditions have become intolerable. No reasonable person could be expected to continue working in such an environment. Although you have not fired me, your knowing indulgence of the actions taken against me constitutes constructive termination. I am therefore compelled to resign.

## I.     The Custody Court Under President Judge Baratta

In 2014, nine years ago, there was no custody office. The court was drowning in custody cases, and they seriously hampered the operations of the entire court. The daily proceedings in Motions Court were swamped with custody disputes, both large and small. On each weeks Miscellaneous Hearing List, every judge was assigned multiple custody cases. On the monthly Non-Jury Trial Lists, there were typically as many as fifty to seventy custody cases, an impossible number.

In 2014, then-President Judge Stephen G. Baratta completely overhauled the custody court. He created the position of full-time custody master and hired me to fill that role. He placed me in charge of all administrative functions of the custody court, reporting directly to him. The judges and attorneys responded well to the new procedures we implemented, and they began to make great use of the custody office.

As a result of Judge Baratta's overhaul of the custody court and implementation of our new custody procedures, we were able to reduce the number of custody filings by twenty-five percent. Previous custody masters had settled approximately thirty percent of their

cases. By contrast, I settled approximately eighty-five percent of my cases. The number

of custody petitions presented at the daily proceedings in Motions Court and on the

weekly Miscellaneous Hearing Lists slowed to a trickle. Even when cases failed to settle

and moved forward to trial, I continued working to settle them. Thus, of the fifteen

percent of cases that did not settle at the initial conference with me, more than half settled

between the time of the conference and the time of trial. At the start of a typical Non-Jury

Trial week, instead of having fifty to seventy custody cases on the list, now

there typically would be only five to fifteen cases. Most of those cases were so well

prepared, and so thoroughly documented in my written case summaries, that the judges

were able to settle them without conducting a trial, eliminating the need for generating

expensive transcripts and performing time-consuming analyses and written judicial

opinions. In short, the new system, which Judge Baratta envisioned and I designed

and implemented, ran beautifully.


**II. The Custody Court Under President Judge Koury**


When Judge Michael J. Koury, Jr. became President Judge in 2018, he maintained the

custody procedures that Judge Baratta had established during his administration. In

addition, President Judge Koury created a formal Custody Division of the court. He

appointed Judge Sletvold to serve as Administrative Judge of the Custody Division. As I

have outlined extensively in previous memoranda, from the very beginning of her


tenure as Administrative Judge of the Custody Division, Judge Sletvold was inexplicably

threatened by me. She was determined to limit my authority and my value to the other

judges. She went so far as to prohibit me from even speaking to the other judges, an order

that was contrary to my years of practice and that President Judge Koury quickly

overruled. When Judge Sletvold's efforts to restrict my role failed, she demanded that President Judge Koury fire me. President Judge Koury refused. He advised her that he and the other judges greatly valued the role I played at the court and that if she could not work with me, he would appoint a different judge to oversee the Custody Division. Judge Sletvold repeatedly refused to accept President Judge Koury's directives about how I was to perform my job. She would not cease her obsessive efforts to have me fired.

Thus, after only one year, President Judge Koury removed Judge Sletvold from her position as Administrative Judge of the Custody Division. He told me that I would never again be required to speak to her. In the four years since then, I have not spoken to her. After President Judge Koury removed Judge Sletvold as Administrative Judge of the Custody Division, he appointed Judge Baratta to replace her. Judge Baratta resumed his prior control of the custody court, and he continued to run it very successfully until January 2022, when he stepped down. At that time, President Judge Koury appointed Judge John M. Morganelli to succeed him as Administrative Judge of the Custody Division.

Even after Judge Sletvold was removed as my boss and forbidden to speak to me, she continued to wage an unrelenting campaign of attacks against me. She enlisted the support of Judge Roscioli and Court Administrator Greene, both of whom were also threatened by me, for reasons I have never been able to decipher. Over the past five years, the three of them have never stopped prosecuting their personal vendetta against me.

**III. Your Decision To Demote Me When You Became President Judge**

When you succeeded Judge Koury as President Judge of the Court in May 2023, you immediately endorsed the agenda of Judges Sletvold and Roscioli and allowed Court

Administrator Greene to take control of the administrative functions of the Custody Division. Mr. Greene immediately stripped me of my duties, responsibilities, and authority. Although Mr. Greene was not an attorney and had no idea how the custody office functioned, he insulted my competence and professionalism, telling me that I was ineffective at my job. He hired a part-time master, Roseann Joseph, who had been selected by Judges Sletvold and Roscioli. He downgraded my status below that of the part-time custody master, assigning her the more important cases, giving her exclusive control over our two staff assistants, and forcing me to begin performing my own clerical work. He identified all of the things I did that made me valuable to the judges, and ordered me to stop doing them. For example, he told me that if judges called me for help with their hearings or trials when I was holding a custody conference, I was to refuse their requests and tell them I could not interrupt my conference because I was not permitted to alter my conference schedule. He told me that if a case did not settle within

its allotted one-hour time slot, I was to abandon the case, list it for trial, and move on to the next case. He told me that I must cease my practice of working at night and on weekends to settle cases and assist judges with drafting their custody orders. He said that my working long hours only proved that I had a & time-management problem.; Mr. Greene's directives were transparent efforts to fulfill Judge Sletvold's and Judge Roscioli's longtime goal of restricting my role, diminishing my value to the other judges, making me appear lazy and incompetent, thereby making it easier to terminate me.

**IV. Mr. Greene's Efforts To Sabotage the Custody Division**

One month ago, on September 11, 2023, Mr. Greene fired Susan Stametz, our most valuable staff assistant, for no legitimate reason. Although Ms. Stametz was an

exceptional employee and was vital to the functioning of the Custody Division, Mr. Greene did not replace her and has made no effort to do so. In the month since then, he has assigned no one to perform most of the one-hundred-plus tasks that Ms. Stametz previously performed on a weekly basis. He has deliberately left her email account and telephone number active but has refused to review her incoming emails and telephone messages, leading parties and attorneys to believe that she still works for the County but is simply refusing to respond to their urgent requests. These tactics have not only made Ms. Stametz and me appear incompetent and unprofessional, they have also created staggering problems for parties, attorneys, and judges.

Our one remaining staff assistant, Lauren Haas, is not performing Ms. Stametz's tasks. She has no time to perform even the most mission-critical tasks of the Custody Division, because Mr. Greene completely changed her job description and now requires her to serve as personal assistant to the part-time custody master, Roseann Joseph. Although no custody master, including me, has ever had a personal assistant (Northampton County does not have the budget for that), Mr. Greene deliberately allowed Master Joseph to monopolize every moment of Ms. Haas's time. Ms. Haas tells me that Master Joseph overloads her with incomprehensible requests, pages her whenever she steps away from her desk to file orders or check out files, and bombards her with phone calls outside regular business hours, even though she is only an hourly-paid worker and does not receive compensation for responding to such calls. Attorneys regularly tell me that Master Joseph berates and insults Ms. Haas in front of parties and attorneys. Ms. Haas is well-liked by the attorneys, and they find this behavior distressing. Ms. Haas is now overwhelmed and unable to handle the demands being placed on her. It is only a matter of time before she leaves the County for a better position where she will not be subjected to such treatment.

**V. Your Decision To Reverse Course, Remove Mr. Greene from the Custody Division, and Restore Me To My Former Position**

On Wednesday of this week, October 11, 2023, you held a lengthy meeting with Mr. Greene and my immediate superior, Judge Morganelli, Administrative Judge of the Custody Division. At that meeting, Judge Morganelli detailed numerous catastrophic failures that had occurred in the Custody Division after you had allowed Mr. Greene to

take over my job responsibilities. Judge Morganelli advised that the Custody Division had descended into chaos under Mr. Greene's direction and was now in free fall.

As it was reported to me by Judge Morganelli, at the end of the meeting, you and Judge Morganelli agreed that allowing Mr. Greene to take over my job responsibilities had been a disaster. You and Judge Morganelli advised Mr. Greene that he would no longer have any authority over the Custody Division and that I would be restored to my former position. After the meeting, Judge Morganelli sent me an email stating:

Effective immediately, with approval of the [President Judge], you shall be charged with the scheduling of all of the custody conferences and assigning them to either yourself or [Master Joseph]. Court Administration will no longer be involved in the day to day operations of the custody division.

**VI. Your Reversal of Your Decision To Remove Mr. Greene, Followed By Judge Morganelli's Resignation as Administrative Judge of the Custody Division**

The following day, Thursday, October 12, 2023, Judge Morganelli called to tell me that you had reneged on the agreement that you and he had reached the day before. Apparently, you still agreed with Judge Morganelli that removing Mr. Greene from the

Custody Division was the right thing to do, but you were now afraid to do so, because

Mr. Greene had complained to the Administrative Office of the Pennsylvania

Courts (AOPC).

In response, Judge Morganelli immediately submitted his resignation as Administrative

Judge of the Custody Division. He pointed out that you had deprived him of decision-

making authority and were allowing Mr. Greene, an administrative support employee, to

dictate policy and procedure to a judge, which he found unacceptable. He said that your

indulgence of Mr. Greene's behavior had now made it impossible for him to administer

the Custody Division and save it from certain collapse.


**VII. Court Administration's Outrageous Harassment of My Son Jake When He Came to the Courthouse To Collect the Personal Belongings of the Staff Assistant Whom Mr. Greene Had Fired**


Yesterday, my 23-year-old son Jake and his friend Bob, the 20-year-old son of Susan

Stametz's significant other, came to the courthouse to pick up Ms. Stametz's personal

belongings. I had gathered Ms. Stametz's personal items and placed them on the floor in

Lauren Haas's office in the custody office suite.

County Executive Lamont McClure has exclusive jurisdiction over the custody office. At

Mr. McClure's directive, access to the custody office is controlled by the Sheriff of

Northampton County, Rich Johnston, who reports to Mr. McClure. Ms. Haas and I were

both taking a vacation day yesterday. Ms. Haas was attending a wedding, and I had an

appointment for an important medical procedure in Virginia. Thus, neither of us were

going to be present at the courthouse when Jake and Bob came to collect Ms. Stametz's

personal items. Accordingly, Ms. Stametz pre-arranged with the Sheriff's Office that Jake

and Bob would check in with the Sheriff's deputies when they arrived at the courthouse, that they would use my key to enter Lauren Haas's office to retrieve Susan's personal items, and that they would follow any and all directives of the Sheriff's Office while they were there.

As pre-arranged, when Jake and Bob arrived at the courthouse yesterday, they checked in with the Sheriff's deputies and followed the deputies; instructions. However, when Jake and Bob arrived at the custody office, the part-time custody master, Roseann Joseph, questioned their authority to be there. They explained who they were and why they were there, but Master Joseph was unpersuaded. She went into her office, and a few moments later, Mr. Greene's Deputy Court Administrator, Gina Gibbs, entered the custody office. Ms. Gibbs forcefully told Jake and Bob that they had no right to be there, and she ordered them to leave immediately. Jake explained that he and Bob had received permission from the Sheriff's Office to collect Susan's personal items. Ms. Gibbs told Jake that it was "not the Sheriff's decision to make."; She said that Court Administration, not the Sheriff, controlled the custody office. She said that Court Administration would have to ensure that Ms. Stametz, Jake, and Bob were not attempting to improperly remove any court property or court documents from the courthouse.

Ms. Gibbs's contentions were preposterous. First, as noted above, it was unquestionably the County Executive, and, by his authority, the Sheriff, who controlled access to the custody office, not Court Administration. Second, Jake and Bob had followed all appropriate protocols, had politely explained why they were there, and clearly posed no security threat. Third, it was obvious at a glance that the small collection of personal items sitting on the floor of Ms. Haas's office consisted solely of Ms. Stametz's mini refrigerator and microwave, her lamp, her family photos, her potted plants, her holiday decorations, a couple of sweaters, some cough drops, and a few other odds and ends. There was no office equipment, no files, no folders, nor any documents of any kind.

Nevertheless, Ms. Gibbs aggressively warned Jake and Bob that they must abandon Ms. Stametz's personal items and vacate the premises immediately.

I do not blame Ms. Gibbs for falsely telling Jake and Bob that the Sheriff had no authority to permit them access to the custody office. Ms. Gibbs only recently started her job, and she was undoubtedly acting on orders from Mr. Greene. Mr. Greene, however, was well aware that the County Executive, not Court Administration, controls the custody office and that Court Administration has no authority to control access to that suite of rooms. Thus, if Mr. Greene advised Ms. Gibbs that the Sheriff had no authority to grant access to the custody office, Mr. Greene was lying to her.

After Ms. Gibbs evicted Jake and Bob from the custody office, they returned to the Sheriff's Office. County Executive Lamont McClure was made aware of the situation. Mr. McClure then directed Rich Johnston, Sheriff of Northampton County, to send two armed deputies to escort Jake and Bob back to the custody office. Mr. McClure and Sheriff Johnston directed the deputies to take any action they deemed necessary to ensure that the boys were permitted to remove Ms. Stametz's personal belongings from the courthouse. Mr. McClure specifically directed that the deputies were to take no orders from the Office of Court Administration.

When the two armed deputies escorted Jake and Bob back to the custody office, Custody Master Roseann Joseph again questioned their authority to be there. The deputies advised Master Joseph that they had arranged for someone from Court Administration to observe Jake's and Bob's removal of Ms. Stametz's personal items. Shortly thereafter, two employees from Court Administration (not Ms. Gibbs) arrived to observe.

Within approximately one minute, the two employees agreed with Jake and Bob that none of Ms. Stametz's personal items were court property. The deputies stayed to ensure that Jake and Bob were able to take Ms. Stametz's belongings out to their vehicle.

This episode was utterly absurd and an embarrassment to the court. Mr. Greene obviously had no genuine concern that Ms. Stametz was trying to steal court property or court documents. He was simply harassing these two innocent boys as a way to continue harassing Ms. Stametz and me, in obvious retaliation against us for the serious and well-founded complaints we had made about him. More disturbing, Mr. Greene knew that these two unsuspecting boys would have no way of knowing that Ms. Gibbs's statements about Court Administration's asserted jurisdiction over the custody office were false. Mr. Greene knew that the boys would be defenseless against his bullying tactics. Jake and Bob were fortunate that County Executive Lamont McClure intervened in the situation and ordered Sheriff Johnston to overrule Mr. Greene.

This entire episode was embarrassing and shameful. The fact that Mr. Greene would stage a hostile confrontation with the Sheriff's Office over a few house plants and some family photos is simply one more indication that Mr. Greene will stop at nothing to prosecute his vendetta against me.

**VIII. My Inability To Continue Performing My Job**

Like Judge Morganelli, I find that Mr. Greene's interference in the custody office has made it impossible for me to continue performing my job. Mr. Greene has stripped me of my duties, responsibilities, and authority. He has downgraded my status below that of the part-time custody master. He has fired my most valuable assistant, for no legitimate reason. My one remaining assistant is now completely overwhelmed and unable to perform her duties. Almost all of the administrative functions of the Custody Division, including many that are mission-critical, have now fallen by the wayside and are no longer being performed by anyone.

I am now forced to spend much of my time doing clerical work instead of my own job,

settling custody cases. I also spend a great deal of time addressing the never ending barrage of complaints I receive from parties and attorneys about Mr. Greene's inexcusable failures. Many of the parties and attorneys lodging these complaints have complained directly to Mr. Greene, but they tell me that he has simply ignored them and failed to respond.

Judge Morganelli, my boss and longtime colleague, with whom I have always enjoyed an excellent professional relationship, has now resigned. He has told you that Mr. Greene's behavior, and your indulgence of Mr. Greene's behavior, have made it impossible for him to administer the Custody Division. Judge Morganelli is a gifted leader. He has a powerful intellect, incisive judgment, and strong interpersonal skills. If it is impossible for him to do his job, it is certainly impossible for me to do mine.

More important, Mr. Greene has defamed me, publicly humiliated me, and made every effort to make me appear lazy and incompetent. I cannot continue working in an environment that allows Mr. Greene the opportunity to inflict further damage on my professional reputation. No reasonable person could continue working under these conditions. The situation has become intolerable. Although you have not fired me, as noted above, Mr. Greene's actions, and your knowing indulgence of his actions, constitute constructive termination. Thus, I must resign.

This is my two weeks; notice. However, if you would prefer that I vacate my position sooner, I will comply.

**End of Custody Master Statement.**

## Exhibit B

Michael Madigan
517 McKean Avenue
Charleroi, PA 15002

Dear Michael Madigan,
On 1/30/2025 8:00 AM, you submitted **RTK-02571** with the following request;
*1. Custody Master Lisa Tressler's Summaries*
*• Copies of all case summaries for Vrabel v. Madigan or similar documents prepared by former Custody Master Lisa Tressler during her tenure in the Northampton County Custody Division.*
*• Please include records from the period beginning 2014 to the date of her resignation.*
*2. Complaints Filed Against Lisa Tressler*
*• Copies of any formal complaints, grievances, or administrative reports submitted by attorneys, litigants, or other court staff alleging misconduct, negligence, or procedural violations by Lisa Tressler.*
*• Include complaints filed with:*
*• Northampton County Court Administration and AOPC*
*• The Northampton County Judicial Oversight Committee*
*• Any other internal or external oversight body.*
*3. Correspondence Related to Complaints Against Tressler*
*• Copies of any email or written correspondence related to the investigation, evaluation, or resolution of complaints against Lisa Tressler, including communications involving Northampton County judicial administrators, court staff, or external agencies.*


I am reviewing your request and it has been determined additional time is required to respond to your request because: (1) a legal review is necessary; (2) the extent or nature of the request precludes a response within the required time period; (3) the request requires retrieval; (4) due to staffing limitations.

Once this review is complete, I will notify you of the response to your request no later than March 8, 2025, or your request will be deemed denied on that date.

To the extent any portion of your request was denied, you have the right to appeal. An appeal must be made in writing to the Office of Open Records, Commonwealth Keystone Building, 333 Market Street, 16th Floor, Harrisburg, PA 17126 within fifteen (15) business days of the date of this communication.

By this communication, we consider the Northampton County's obligation to honor your request under the RTKL to be fully fulfilled.

Respectfully,
 David M. Ceraul, Esquire
Open Records Office
669 Washington Street
Easton, PA  18042