

1835 MARKET STREET SUITE 515
PHILADELPHIA, PA 19103
(215) 569-1999 **FAX** (215) 569-3870

SIDNEY L. GOLD * +
JAMIE L. FORD *
BRIAN C. FARRELL *

* ALSO ADMITTED IN NEW JERSEY
+ ALSO ADMITTED IN NEW YORK

April 7, 2025

<u>Via ECF</u>
The Honorable John M. Gallagher
U.S. District Court for the Eastern District of Pennsylvania
504 W. Hamilton Street, Suite 4701
Allentown, PA 18101

> RE:    **Tresslar v. Northampton County Court of Common Pleas, et. al.**
>        <u>**C. A. No.: 24-cv-1435 (JMG)**</u>

Dear Judge Gallagher:

As Your Honor is aware, this office represents Plaintiff Lisa Tresslar in the above-referenced matter.  Following our March 27, 2025 telephone conference and directives by Your Honor, I write concerning the status of the Parties' outstanding discovery issues and in response to Defendants' letter of April 3, 2025.

The Parties have been unable to agree on a protective order, because Defendants insist that (1) they should have the unfettered right to designate documents "Attorneys Eyes Only"; (2) Tresslar should not be permitted to see those documents; and (3) Tresslar should bear the burden of seeking relief from the court to lift that designation for individual documents.  We cannot agree to such a provision, because it would prevent Tresslar from assisting her own attorneys in preparing her case.  In addition, it would make it financially prohibitive for her to contest their designations.  The only basis for Defendants' extreme position is their suggestion that Tresslar might leak confidential information to blogger Bernie O'Hare.  This suggestion is baseless and insulting.  Defendants know that Tresslar has never leaked any confidential information to Bernie O'Hare.  This is just an excuse to conceal the evidence from Tresslar and prevent her from using it to assist her attorneys in preparing for depositions and trial.

1

At the time Tresslar was constructively terminated by the court in October 2023, she had not spoken to Bernie O'Hare in years.  When she advised O'Hare of her departure from the court, the only things she gave him were (1) her formal memorandum of resignation; (2) the name of another attorney whose clients wished to speak with him; and (3) a written summary Tresslar had prepared that explained the basis for her allegations of judicial misconduct.  Tresslar explained that (1) in 2018, in Bucks County, seven-year-old Kayden Mancuso had been murdered by her father; (2) there had been a wave of public outcry against the custody judge who had allowed the father to have unsupervised visits; (3) thereafter, two Northampton County judges, Judges Sletvold and Roscioli, had sought to insulate their own reputations by bullying custody litigants into settlements so that the judges could avoid hearing evidence of danger to children and avoid being held accountable for the outcomes; (4) the two judges had attempted to silence the counselors who provided evidence to the court about potential danger to children, even in cases where the parties had agreed that the evidence would be admissible and even though the court had always considered such evidence in the past, as do courts across the state; (5) these two judges had begun refusing parties' requests for court-ordered family counseling unless the parties would agree that any statements made in counseling would be inadmissible in court for any purpose, a position that had no basis in the law; (6) Tresslar had resisted these two judges' efforts; (7) Defendants had then waged a campaign to remove and discredit Tresslar; and (8) when Tresslar had finally exercised her First Amendment right to speak out publicly about the judges' misconduct, Defendants had retaliated against her for doing so.  Tresslar was careful not to give Bernie O'Hare any custody litigants' names or other identifying information.

Tresslar had a First Amendment right to share this information with the public.  Even the general, non-identifying information she provided to Bernie O'Hare was taken from custody cases in which the attorneys had already advised Tresslar that their clients were willing to have her share their stories.

As Defendants can see from the personal emails and text messages Tresslar produced in discovery, she expressly declined to provide Bernie O'Hare with any confidential information.  She would not even give him a copy of her EEOC complaint.  Indeed, when O'Hare asked Tresslar to identify a specific criminal case she had mentioned, which was a matter of public record, Tresslar declined to do so, expressly stating that that information might enable O'Hare to "connect up the dots" and identify the parties in the related custody case, and Tresslar did not want to publicly identify those parties unless and until they chose to do so themselves.

As soon as Tresslar made her decision to file this lawsuit in federal court, she told Bernie O'Hare that she had to stop talking with him, because she respected Your Honor and did not want to "try her case in the press."  Since the day Tresslar filed this lawsuit, she has not communicated with Bernie O'Hare at all, other than to tell him she can no longer discuss her allegations with him now that the matter is in litigation.  Bernie O'Hare is also an attorney, and he has respected her boundaries.  The only information O'Hare has published on his blog since this lawsuit was filed was information he

managed to glean from federal court filings. He certainly did not need Tresslar's help to access the federal court's docket.

If Tresslar had in fact produced any confidential information to Bernie O'Hare, he would have written about it. As everyone can see, no confidential information about this case has ever appeared on Bernie O'Hare's blog. Thus, the results speak for themselves.

Tresslar is not motivated to provide confidential information to Bernie O'Hare. Simply put, Tresslar does not need to publicly expose the names or identifying details of custody litigants in order to prove her allegations of judicial misconduct.

It goes without saying that the judges' own misconduct is not "confidential information." If individual custody litigants wish to speak with Tresslar or speak out publicly about judicial misconduct that occurred in their own custody cases, they have a First Amendment right to do so. And if Defendants retaliated against Tresslar for speaking out publicly about judicial misconduct, she has a right to pursue her First Amendment claims in court, with full discovery like any other litigant. The Defendants have no right to tie Tresslar's hands by interposing some spurious cloak of confidentiality that they contend overrides the First Amendment.

If Defendants were correct that Tresslar is not bringing this case in good faith but is simply trying to publicly embarrass the judges, she could have done that many times over the past six years, without bringing a lawsuit or obtaining discovery. To name but one obvious example, in 2019, Judge Sletvold asked the President Judge of the Court to fire Tresslar, but after he investigated, Judge Sletvold was compelled to resign from her position as Administrative Judge of the Custody Division, and the President Judge told Tresslar that she would never be required to speak to Judge Sletvold again. That event was humiliating for Judge Sletvold, but Tresslar remained silent about it for years. She did not speak of it until Defendants' campaign to discredit and injure her became intolerable and she was forced to defend herself. The truth is, given the unrelenting campaign Defendants have waged against Tresslar over the past six years, she has shown remarkable restraint.

Even in 2023 when Tresslar did, finally, publicly air her allegations of judicial misconduct and its implications for the safety of children in Northampton County custody cases, she did not reveal any confidential information.

Now, even though Tresslar has brought her claims in the most dignified and restrained manner possible, under the direct supervision of a federal judge, Defendants are trying to prevent her from seeing the evidence, based solely on their unfounded speculation that she might leak the evidence to Bernie O'Hare. As noted above, there is no basis for this speculation. Tresslar is herself an officer of the court and will be ethically obligated to respect the parties' confidentiality designations under a protective order. Tresslar is a respected attorney with almost forty years of experience and an

3

unblemished record.  She has never done anything to suggest that she would jeopardize her professional reputation or her law license by violating a protective order.  The mere fact that Tresslar has spoken to blogger Bernie O'Hare in the past about matters she was allowed to disclose, and that O'Hare has praised Tresslar and criticized Judge Sletvold, is no basis for barring Tresslar from having access to material evidence in her own First Amendment case.

Tresslar has fully complied with this court's scheduling order.  The discovery deadline was April 18, 2025.  Both parties issued document requests.  Tresslar agreed to sit for her own deposition on February 19, 2025 and scheduled several depositions of Defendants to take place in March 2025.  Tresslar timely produced all documents requested of her (some 1,200 Bates-numbered pages), including her own written memoranda, personal emails, and text messages about the substance and background of her allegations, including detailed accounts of events and the people involved in those events.  She freely produced all of the requested documents without benefit of a protective order, trusting that Defendants would act responsibly.

Tresslar did not produce her own work emails, because she does not have them.  Defendants locked her out of her work email account at the time they constructively terminated her in October 2023.  But Defendants have always had Tresslar's work emails in their possession, and they have been free to review them at their convenience.

Defendants canceled Tresslar's February 19, 2025 deposition the night before it was scheduled to take place, asserting that they had been unable to review their own work emails and were therefore unprepared.  Shortly thereafter, Defendants acknowledged that they would have to cancel all of the other scheduled depositions, for the same reason.  Defendants then asked Plaintiff's counsel to agree to a three-month extension of the court's discovery deadline.  They asserted that they had been unable to even obtain, let alone review, their many thousands of work emails, including Tresslar's, because the emails were stored on the County's email server.  They said they were in the process of talking to the County to arrange a mutually agreeable procedure to give them access to the emails.  They described this as an "unforeseen" problem.  They gave no explanation for why they had waited an entire year after the start of litigation to find out where their emails were located and engage in discussions with the County about how to access them.  As of last week, Defendants were still asserting that they did not yet have access to their emails.  They said it might take "weeks" before they could even gain access, let alone review the emails and complete their document production.  Needless to say, Defendants should have done their due diligence a year ago instead of committing to the court that they would comply with the court's scheduling order when they had made no effort to even locate their emails.

When the deadline arrived for Defendants' production of documents, they produced nothing, not even the documents that were not maintained on the County's email server.  Defendants' counsel declared that Defendants would not produce anything unless and until

Tresslar agreed to a protective order that would allow them to designate documents "Attorneys Eyes Only" so that Tresslar could not see them. This condition was unacceptable. We said we would need to seek the court's intervention. A week after this discussion, Defendants belatedly produced a small number of inconsequential documents but nothing more.

The undersigned counsel had no choice but to agree to Defendants' requested three-month extension of the court's discovery deadline, because without any documents, Tresslar cannot prepare for depositions or trial.

As noted above, Tresslar is a respected attorney with almost forty years of experience and an unblemished record. She has done nothing wrong. Defendants' request to prevent Tresslar from seeing the material evidence in her own case, and to place the burden on Tresslar to ask the court to lift the "Attorneys Eyes Only" designation for individual documents, is punitive, financially prohibitive, and totally unfair.

In Defendants' April 3, 2025 letter to Your Honor, Defendants now assert, for the first time, that they have finally gained access to their thousands of work emails. However, they have given no estimate for how long it will take them to review those emails and complete their document production so that Tresslar can start preparing for depositions.

In their April 3, 2025 letter to Your Honor, Defendants also now assert, for the first time, that the documents they seek to conceal from Tresslar are privileged communications. This statement makes no sense. If the documents are in fact privileged, then Defendants cannot produce them to Plaintiff at all, even designated "Attorneys Eyes Only," or they will be deemed to have waived the privilege. The proper procedure is to withhold those documents, identify them in a privilege log, and state the basis for the claimed privilege so that, if necessary, the court can later make a determination whether the claim of privilege is justified. Defendants have not revealed the purported "privilege" they are relying on, nor have they explained how the documents in question would be covered by such a privilege. Frankly, we are at a loss to decipher what kind of documents Defendants could be talking about or the basis for their claim of privilege.

In their April 3, 2025 letter to Your Honor, Defendants further assert that Tresslar has provided privileged communications to Bernie O'Hare. This is impossible, because Defendants have never given Tresslar any privileged documents or information that she could have shared with O'Hare. Of course, had they done so, the very act of providing the documents to Tresslar would have waived the privilege. But we need not address waiver, because Defendants have never given Tresslar any privileged documents or information.

It may be that Defendants are not talking about "privileged" documents at all but simply documents that contain non-public information about custody cases. As Defendants well know, most

information in custody cases is fully open to public view in the Prothonotary's Office.  Information that is non-public is certainly sensitive and worthy of protection here, as reflected in Plaintiff's own proposed protective order.  Tresslar has made it clear that she has not disclosed, and has no intention of disclosing, parties' names or other identifying information without their express consent.  But that information is certainly not privileged, nor should Defendants be permitted to conceal it from Tresslar in the context of this First Amendment case.  To the extent that there might be any dispute about how such information should be handled, Your Honor can rest assured that Tresslar will scrupulously comply with any protective order issued by the court and will present any disputes to Your Honor for resolution.  We are not talking about trade secrets, like the formula for Coca-Cola.  The confidential information in this case can be easily identified and easily protected.

If Defendants are talking about confidential personnel records of other employees, Tresslar of course would not insist on their producing those documents.

Defendants know that the documents they are seeking to conceal from Tresslar are not privileged, or they would not be offering to produce them, under any circumstances.  Defendants also know that Tresslar has never provided any confidential information to Bernie O'Hare.  This is just Defendants' excuse to conceal material evidence from Tresslar.  Their true concern is that their documents are harmful to their position, that Tresslar will recognize the significance of those documents, that she will use them to prepare her case, and that she will ask about them in depositions. She has every right to do that.  If Defendants can prevent Tresslar from seeing these documents, they will have obtained a grossly unfair advantage in this litigation.  Both Defendants and their counsel (in-house attorneys for the Administrative Office of the Pennsylvania Courts) are intimately acquainted with the inner workings of the Northampton County Custody Court, while Tresslar's counsel are not. Attorneys always rely on their clients to explain the significance of documents and assist them in deciding how to use the documents in litigation.  Defendants' proposed protective order will not only hamstring Tresslar's ability to work with attorneys to prepare her case, it will also make it prohibitively expensive for her to move forward to trial.  If Defendants believe that there is some document so sensitive that even Tresslar should not be allowed to see it, they should bear the burden of seeking appropriate protection for that document from the court.

We respectfully request that the court adopt the proposed protective order that the undersigned counsel submitted to Your Honor ahead of last week's telephone conference.

Respectfully,

*/s/Sidney L. Gold*

SIDNEY L. GOLD

SLG/dd
cc: all counsel of record via ecf