## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LISA L. TRESSLAR** | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 5:24-cv-01435-JMG |
| | : | |
| **J. JERMAINE GREENE, SR.,** *et al.*, | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

**GALLAGHER, J**                                        **February 2, 2026**

### I.    INTRODUCTION

Plaintiff Lisa Tresslar ("Plaintiff" or "Tresslar"), former full-time Custody Master for the Northampton County Court of Common Pleas (the "County Court") claims she was constructively terminated from her employment in retaliation for concerns she expressed over the County Court's Revised Custody Guidelines (the "Revised Guidelines") in violation of her First Amendment rights. Now, in the face of Defendants' Motion for Summary Judgment, Plaintiff must point to evidence from which a jury could agree with her. She has not done so.

Notwithstanding the benefit of inferences drawn in her favor, Plaintiff has failed to demonstrate a genuine dispute of material fact as to her claims against Defendants. Therefore, Defendants' Motion is granted and Plaintiff's remaining claims are dismissed.

### II.    FACTUAL BACKGROUND

Plaintiff is an attorney who served as Custody Master for the County Court from 2014 until 2023. *See* Amend. Compl. ¶¶ 15-16, 18. Plaintiff was hired as the County Court's first full-time Child Custody Master. *Id.* at ¶ 16. Plaintiff's responsibilities included facilitating conferences between litigants, preparing case summaries, and designing and implementing administrative

procedures for the County Court. *Id.*

In late 2021, the County Court began the process of changing its Custody Guidelines. Plaintiff alleges that the District Court Administrator, Jermaine Greene ("Defendant Greene") informed Judge Stephen G. Baratta ("Judge Baratta"), the then-Administrative Judge of the Custody Division, that the County Court had received Revised Guidelines to the County Court's Custody Provision from the Family Law Committee of the Northampton Bar Association (the "FLC"). *Id* at ¶ 27. The FLC later denied this and instead, stated that the Revised Guidelines had been sent to the FLC by someone at the County Court. *Id.* at ¶ 28.

In March 2022, Plaintiff alleges that Judge Jennifer Sletvold ("Judge Sletvold"), Judge Paula Roscioli ("Judge Roscioli"), and Defendant Greene proposed the adoption of new administrative procedures for the County Court's Child Custody Division. *Id.* at ¶ 31. Plaintiff opposed the Revised Guidelines, claiming that the changes targeted Plaintiff and significantly diminished her role in the child custody process by restricting judges' access to her and imposing overly burdensome restrictions on her ability to settle custody cases and assist judges in conducting their custody hearings and trials. *Id.* at ¶ 31.

In June 2022, Plaintiff sent a memorandum opposing the Revised Guidelines to Judge John M. Morganelli ("Judge Morganelli"), Administrative Judge of the Custody Division. *Id.* at ¶ 35. Plaintiff allegedly told Judge Morganelli that she had "grave concerns" about Judges Sletvold and Roscioli's motives in requesting the Revised Guidelines. *Id.* at ¶ 33. While Judge Morganelli did not involve Plaintiff in the collective discussions concerning the Revised Guidelines, he advised her that she should focus on the mechanical issues that would need to be addressed in the event that the President Judge decided to implement the Revised Guidelines. *Id.* at ¶ 34.

In July 2022, a Judicial Conduct Board ("JCB") investigator interviewed Plaintiff regarding a different complaint lodged against Judge Sletvold. The JCB investigator approached

Plaintiff in her workplace because the complainant had named Plaintiff among several individuals who might have relevant information. During that interview, Plaintiff reiterated many of the same concerns about the Revised Guidelines and judicial misconduct that she had raised before.

Then, in January 2023, Plaintiff attended an FLC meeting (the "FLC Meeting") to discuss the Revised Guidelines, including her concerns and criticisms of them. *Id.* at ¶ 36. Plaintiff also noted to the FLC her concerns regarding certain judges. *Id.* at ¶ 37-40. Specifically, Plaintiff informed the FLC that certain judges had attempted to coerce litigants into entering particular agreements, and that the Revised Guidelines would allow and even encourage such judges to place undue pressure on litigants to enter similar agreements in the future. *Id.* at ¶ 39-40. Relatedly, she urged the FLC to consider that the Revised Guidelines would permit certain judges to violate their duties to hear the evidence presented to them and make decisions necessary to protect children. *Id.* at ¶ 40. Plaintiff alleges that all named Defendants were aware of her comments to the FLC. *Id.* at ¶ 41. Defendants, however, dispute that they knew of Plaintiff's comments at the FLC Meeting.

In May 2023, Craig A. Dally ("Judge Dally" or "Defendant Dally") became President Judge of the County Court. *Id.* at ¶ 48. Two months later, on July 6, 2023, Defendant Dally promulgated the new Custody Division procedures, adopting the Revised Guidelines discussed above. *Id.* at ¶ 49. A week later, on July 14, 2023, Plaintiff alleges that she sent Judge Dally an email to reassert her opposition to the new procedures and detail the detrimental effect the new procedures would have on the County Court and Plaintiff's ability to perform her job. *Id.* at ¶ 50.

Plaintiff's Amended Complaint pleads a series of allegedly retaliatory changes to her role following the email she sent to Judge Dally. First, she alleges that Judge Dally shifted his supervisory power over Plaintiff to Defendant Greene. *Id.* at ¶ 53. Next, she maintains that Defendant Greene subordinated Plaintiff to work under a part-time custody master, Roseann Joseph ("Joseph"). *Id.* at ¶ 54. In addition, Plaintiff represents that Defendant Greene allegedly

reorganized Plaintiff's caseload, assigning her a greater number of cases involving unrepresented litigants, while assigning Joseph a greater percentage of cases involving attorneys. *Id.* at ¶¶ 55-56. Lastly, Plaintiff alleges that she was restricted in her ability to manage cases and facilitate settlement between litigants.[1] *Id.* at ¶ 57.

Plaintiff alleges that this changed on October 11, 2023, when Judges Dally and Morganelli removed Defendant Greene's authority over the Custody Division and restored Plaintiff's job to the way it was before Defendant Greene had taken over. *Id.* at ¶ 59. However, Judge Dally allegedly reversed this decision the following day after Defendant Greene registered a complaint with the Administrative Office of Pennsylvania Courts. *Id.* at ¶ 61. Two days later, on October 14, 2023, Plaintiff resigned from her position as Custody Master. *Id.* at ¶ 63.

## III.    PROCEDURAL HISTORY

Plaintiff initiated this lawsuit in April 2024. *See* Complaint, at ECF No. 1. On June 27, 2024, Plaintiff filed an Amended Complaint alleging (1) sex discrimination in violation of Title VII (Count I); (2) retaliation in violation of Title VII (Count II); (3) First Amendment Retaliation (Count III); and (4) a violation of the Equal Protection Clause (Count IV). *See* Amend. Compl. Defendants moved to dismiss each of Plaintiff's claims. On October 18, 2024, the Court dismissed Plaintiff's sex discrimination and Equal Protection claims, as well as all claims against Judges Sletvold and Roscioli, leaving active a Title VII Retaliation claim against the County Court and a First Amendment Retaliation claim against Defendants Greene and Dally. *See* Order, at ECF No. 40. On July 15, 2025, Plaintiff voluntarily dismissed her Title VII Retaliation claim. *See* ECF No. 77. Accordingly, this case proceeds on Plaintiff's remaining claims for First

---

[1] Plaintiff states that while Defendant Greene allowed Joseph to take unlimited time to conduct her conferences and settle her cases, Defendant Greene directed her to halt each of her conferences at the end of its allotted one-hour time slot, whether the case had settled or not.

Amendment retaliation against Defendants Greene and Dally.

## IV.     LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that a judge shall "grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Essentially, the Court must analyze "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. A genuine issue of fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). At this stage of litigation, all facts presented are viewed in the light most favorable to the nonmoving party, and the moving party "has the initial burden of demonstrating that *no* genuine issue of material fact exists." *Daniels v. City of Pittsburgh*, 2023 WL 2707178, at *2 (3d Cir. Mar. 30, 2023); *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993) (emphasis added).

To survive a properly supported motion for summary judgment, the nonmoving party must present affirmative evidence of specific facts in the record to demonstrate a genuine issue of material fact. *Anderson*, 477 U.S at 256-57; *Berkeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citing *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare,* 402 F.3d 374, 379 (3d Cir.2005)) ("Although the non-moving party receives the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact."). It is not enough to "deny the allegations in the moving party's pleadings; instead [Plaintiff] must show where in the record there exists a *genuine* dispute over a material fact." *Doe v. Abington Friends School*, 480

F.3d 252, 256 (3d Cir. 2007) (citations omitted) (emphasis added). In making this showing of a genuine dispute, "the non-movant may not rest on speculation and conjecture..." *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016). In addition, "conclusory, self-serving affidavits are insufficient to withstand . . . summary judgment." *Gonzalez v. Sec'y of Dept. of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012). It is not the role of the Court to weigh the evidence provided by the Parties and make a determination as to which facts are true. Rather, the Court is instructed "to determine if there is a genuine issue for trial." *Josey,* 996 F.2d at 637.

## V.    ANALYSIS[2]

Plaintiff's remaining claim is that Defendants retaliated against her for her exercise of her First Amendment rights. She seeks recourse under 42 U.S.C. § 1983, which authorizes suits against state and local government actors for constitutional violations. It is well established that public employees possess a constitutional right to express themselves on matters of public concern, free from the fear of retaliation. *See, e.g.*, *Connick v. Myers*, 461 U.S. 138, 142 (1983) ("[I]t has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutional protected interest in freedom of expression."); *Pickering v. Board of Educ. of Township High School*, 391 U.S. 563, 574 (1968) ("Statements by public officials on matters of

---

[2] Plaintiff's reliance on the law-of-the-case doctrine is misplaced. The Court's earlier ruling on the Motion to Dismiss addressed only the sufficiency of the pleadings, accepting the allegations as true for that limited procedural purpose. That determination does not constitute a factual finding, nor does it preclude the Defendants from challenging those allegations at this stage, where the governing standard is different. To the extent Plaintiff contends that the Court's acceptance of an allegation as plausible at the Rule 12(b)(6) stage forecloses Defendants from disputing that allegation on a developed evidentiary record, the argument is a non-starter.

If Plaintiff is seriously advancing the position that a Rule 12(b)(6) ruling bars Defendants from contesting the facts underlying that allegation, it reflects a misunderstanding of the distinct roles of the pleadings and evidentiary record. At this stage, the Court is required to evaluate actual evidence, not assumed facts, and nothing in the prior ruling limits Defendants' ability to present such evidence or the Court's ability to consider it.

public concern must be accorded First Amendment protection"). That right, however, is not absolute, and must be balanced against the interest of the State in "promoting the efficiency of the public services it performs through its employees." *See Connick*, 461 U.S. at 142 (quoting *Pickering*, 391 U.S. at 568).

The balance between the First Amendment and the government's efficiency interest is analyzed through a three-step framework, whereby a public employee must show the following. First, the employee must show that the speech in question is protected by the First Amendment. *See Dooley v. City of Philadelphia*, 153 F.Supp.2d 628, 640 (E.D. Pa. 2001). If their speech is protected, the employee must then establish that the speech was a substantial or motivating factor in the alleged retaliatory action. *Id.* If both are established, the burden shifts to the employer, who may establish that it would have taken the adverse employment action regardless of whether the employee had engaged in the protected conduct. *See id.*

Drawing all inferences in Plaintiff's favor, the Court will review the episodes of speech made by Plaintiff. The Court notes that, although the Plaintiff initially identified additional instances of speech, she subsequently narrowed the episodes of speech at issue by letter submitted to the Court on December 15, 2025, and again during Oral Argument held on December 17, 2025. *See* Letter, ECF No. 123. Accordingly, the Court considers only three instances of speech identified by Plaintiff as alleged predicates to Defendants' retaliation.

For a public employee's speech to be protected under the First Amendment, the public employee must show that (1) in making the speech she spoke as a private citizen, and (b) the speech involved a matter of public concern. *See Archie v. City of Philadelphia*, 2025 WL 220024, at *10 (E.D. Pa. Jan. 16, 2025) (citing *Gilles v. Davis*, 427 F.3d 197, 212 (3d Cir. 2005)). Public employees who make statements pursuant to their official duties do not speak as citizens for First Amendment purposes. *Javitz v. Cnty. of Luzerne*, 940 F.3d 858, 864 (3d Cir. 2019). Conversely, a

public employee that does not speak pursuant to official duties instead speaks as a private citizen. *See Daugherty v. Sch. Dist. Of Philadelphia*, 772 F.3d 979, 988 (3d Cir. 2014) (holding that the plaintiff, a school district administrator, was acting as a private citizen when he reported alleged misconduct, since the disclosure fell outside his ordinary job duties). The Supreme Court has described the inquiry into whether the plaintiff spoke pursuant to her official duties as a "practical one," noting that formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform. *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006).

The Third Circuit has articulated several factors to consider when deciding whether an employee's speech is made "pursuant to [her] official duties": (1) whether the employee's speech relates to "special knowledge or experience" acquired through the job, (2) whether the employee raises complaints or concerns about issues relating to their job duties "up the chain of command," (3) whether the speech falls within the employee's "designated responsibilities," and (4) whether the speech is "in furtherance of the employee's designated duties, even if it is not part of them." *Kimmet*, 554 Fed. App'x. at 110-11; *Gorum v. Sessoms*, 561 F.3d 179, 185 (3d Cir. 2009); *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007).

As noted, to satisfy the second prong of the analysis, the movant must demonstrate that her protected activity was a substantial or motivating factor in the alleged retaliatory action. *Schneck v. Saucon Valley Sch. Dist.*, 340 F.Supp.2d 558, 568 (E.D. Pa. 2004). This step requires consideration of two distinct inquires. First, whether the Defendants took an action adverse to the public employee. If so, the second step is to consider whether the motivation for the action was to retaliate against the employee for the protected activity. *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 800 (3d Cir. 2000).

Here, Plaintiff spoke out, on multiple occasions, expressing her criticisms of the Revised Guidelines. Defendants argue that Plaintiff's speech is not protected under the First Amendment

because her speech was made in furtherance of her official duties as a Custody Master and based on knowledge and experience she gained from that role. Moreover, Defendants argue that even if Plaintiff's speech was protected, they were unaware of it and therefore could not have retaliated against her for speech of which they had no knowledge. On the other hand, Plaintiff contends that her speech was protected, and that Defendants unlawfully retaliated against her on the basis of that speech. Plaintiff further argues that she stepped outside her chain of command to speak out about practices that, in her judgment, were putting children at risk and undermining the integrity of family court decision-making.

The Court will undertake this analysis with respect to each episode of speech in turn.

### a. Plaintiff's Memo to the Family Law Committee

On October 14, 2022, Plaintiff sent a memorandum to the FLC President, Elizabeth Kruzel ("President Kruzel"), and other members of the FLC (the "FLC Memo"). *See* ECF No. 96, Appendix 0329. The FLC Memo explained Plaintiff's perceived strengths of the County Court's then-current Custody Procedures. Plaintiff also raised objections to the Revised Guidelines, and she explained how they would diminish her role as Custody Master. According to Defendants, Plaintiff's concerns contained in the FLC Memo owed their existence to her position as a government employee and are, in essence, an employee grievance, which would not be protected. Moreover, Defendants argue that, even assuming this speech is protected, no reasonable juror could find that Defendants were aware of the contents of the FLC Memo. According to Defendants, they could not have retaliated against Plaintiff for speech that they did not know about.

Although Plaintiff emphasizes that the FLC Memo was sent to the FLC, outside the County Court's chain of command, that fact alone is not dispositive. The controlling inquiry is not the identity of the recipient, but whether the employee spoke as a citizen or pursuant to her official duties. *See Taylor v. Pawlowski*, 551 Fed. App'x 31, 32 (3d Cir. 2013) (*citing Foraker*, 501 F.3d

at 243). Speech that is made pursuant to a public employee's official duties is not protected by the First Amendment, even when communicated outside the workplace or to an external audience. *Garcetti*, 547 U.S. at 421-22.

Here, the content and tone of the letter demonstrate that Plaintiff was not speaking in her capacity as a private citizen. Throughout the FLC Memo, Plaintiff repeatedly employed collective language, referring to "we" and "our," thereby presenting herself as speaking on behalf of the County Court, rather than expressing purely personal views. *See App'x to Defendants' Mot. for Summ. J.*, ECF No. 96 ("I estimate that *we* went from settling thirty to forty percent of custody cases to settling more than ninety percent of custody cases... I believe that *our* success in achieving these results can be attributed in large part to the working relationships *we* have developed with outside professionals and the extent to which *we* have made it convenient and affordable for custody litigants to use those professionals' services in resolving their cases, preparing for cases at trial, and educating the court about their disputes... As I understand it, the proposed changes to *our* existing custody procedures that were recently circulated at the Bench Bar Conference were not suggested by the bar association, individual attorneys, or even a significant percentage of the judges."). This framing conveyed institutional concerns and suggested collective knowledge and authority derived from her position as Custody Master.

Courts have consistently recognized that when a public employee frames a communication as institutional rather than personal, the speech is properly understood as made pursuant to official responsibilities and therefore falls outside the protection of the First Amendment. *See Garcetti*, 547 U.S. at 421; *Foraker*, 501 F.3d at 241-43; *Aubrecht v. Pennsylvania State Police*, 389 Fed. App'x 189, 193 (3d Cir. 2010) ("Consistent with the Supreme Court's holding in *Garcetti v. Ceballos*, we have held that where a public employee makes statements within the workplace pertaining to his or her official duties, that speech is not protected by the First Amendment.").

Plaintiff's authoritative language weighs heavily against a finding that her speech was made in an individual, citizen capacity. In addition, Plaintiff did not disclaim authority to speak for the County Court or clarify that the views expressed were solely her own. To the contrary, the FLC Memo's repeated use of collective pronouns reinforces the impression that Plaintiff was invoking her professional role and workplace experience to lend credibility to the communication.

The substance of the letter further confirms that Plaintiff was speaking pursuant to her professional role. Much of the information described in the FLC Memo reflects knowledge acquired through Plaintiff's employment with the County Court, including internal practices, operational concerns, and the anticipated effects of the Revised Guidelines. *See App'x to Defendants' Mot. for Summ. J.*, ECF No. 96 ("Our settlement rates have improved dramatically over the past eight years, largely because parties are encouraged to take the steps necessary to prepare their cases for trial, by pursuing testing, evaluation, counseling, and/or supervised visits… If adopted, these new procedures will ensure that in the majority of cases, the trial judge will be able to insulate himself or herself from learning anything about what took place in co-parenting counseling, even though such evidence may be critically important to the best interests of the children, and even though the parties agreed in advance that such evidence would be admissible at trial"). Moreover, her concerns over judicial misconduct and child safety were tethered to her job. As noted, speech that is based on special knowledge gained through public employment, and that draws directly from workplace responsibilities, is not typically consistent with speech made as a private citizen. Further, even though "speech may be protected even if it concerns information related to or learned through public employment, an employee does not speak as a citizen if the mode and manner of his speech were possible only as an ordinary corollary to [her] position as a government employee." *De Ritis v. McGarrigle*, 861 F.3d 444, 454 (3d Cir. 2017).

Plaintiff also identified herself in the FLC Memo by reference to her position as Custody

Master for the County Court and detailed the functions she performed as a government employee. *See* ECF No. 96, Appendix 0329 ("Because judges are burdened with great responsibility and usually have limited time, I typically summarize these reports in my written case summary to help ensure that the judge does not miss important details… I often suggest particular evidence or subjects the judge may wish to explore at trial or specific questions the judge may wish to have answered by the trial witnesses. This new proposed rule would prohibit me from doing so."). Plaintiff went on to explain how the adoption of the Revised Guidelines would alter her duties and effect the operations of County Court. By anchoring her commentary in her official role and describing the prospective impact on her job responsibilities, Plaintiff reinforced that she was speaking in her capacity as an employee addressing matters arising from her employment, rather than as a citizen offering general commentary on public policy.

Taken together, the collective language, reliance on job-derived information, and Plaintiff's discussion of her role illustrate that the FLC Memo was made pursuant to her professional responsibilities. These features of her speech indicate Plaintiff was not engaged in protected citizen speech, notwithstanding that the FLC Memo was sent to an organization outside the County Court. Accordingly, Plaintiff cannot satisfy the threshold requirement for a First Amendment retaliation claim as it relates to this episode of speech.

### b.  Plaintiff's Statements at FLC Meeting

A few months later, in January 2023, Plaintiff attended an FLC Meeting where she discussed the Revised Guidelines and noted her concerns with them. FLC President Kruzel invited several members of the Court, including Plaintiff, to attend the meeting because the FLC "had questions for Master Tresslar" and the FLC "wanted to understand the rationale" behind the Revised Guidelines. Def. Mot. for Summ. J. at 14-15. President Kruzel stated that it was important for the FLC to hear from the Custody Master because of her special knowledge and experience in

handling custody cases. *Id. See App'x to Defendants' Mot. for Summ. J.*, ECF No. 96, In her deposition, President Kruzel stated, "[Attendees] had questions for Master Tresslar… They wanted to understand the rationale behind the changes to these rules and they wanted to express the concerns that they had about the impact this would have upon our ability to amicably resolve cases without litigation… They wanted to know if she had more insight. Insight that I – you know, we were all trying to speculate and, you know, we wanted to hear from her. I mean, she is the person that, day in, day out, was conducting our conferences for years, and serving kind of as a liaison between the judges, the practitioners. So, you know, her input was really important to us."

Defendants argue that Plaintiff's speech was made squarely within the scope of her employment responsibilities as Custody Master. They assert that Plaintiff functioned as a liaison between the County Court and the FLC, a role that necessarily included attending meetings such as this one, communicating with practitioners, and discussing changes to court procedures. From Defendant's perspective, Plaintiff's presence at the FLC Meeting and her participation in the discussion were not voluntary or personal but instead flowed directly from her assigned role of conveying information and addressing questions on behalf of County Court. Accordingly, Defendants maintain that Plaintiff was acting in her official capacity when she spoke about the Revised Guidelines at the FLC Meeting, rather than as a private citizen.

Defendants further argue that, even assuming Plaintiff's speech was protected, her claim fails because she cannot establish the required causal connection between the speech and any alleged adverse action. Neither Defendant Greene nor Defendant Dally attended the FLC Meeting and Defendants argue there is no evidence that either Defendant was aware of the substance of Plaintiff's remarks. Defendants emphasize that retaliation is impossible without knowledge of the protected activity, and they maintain that no such knowledge existed here.

Plaintiff, on the other hand, argues that her speech at the FLC Meeting constituted protected

speech. She contends that she had no formal responsibility to attend, received no specific directive from her supervisors to do so, and was not required, as part of her position, to speak at such an event. According to Plaintiff, her participation therefore fell outside the scope of her employment, and she maintains that she attended and spoke in her capacity as a private citizen.

The Court disagrees with Plaintiff and concludes that Plaintiff's remarks at the FLC Meeting are not protected speech because they were made pursuant to her job duties. The FLC Meeting was not open to the general public, and Plaintiff did not attend as a member of the FLC. Indeed, Plaintiff was *not* a member of the FLC and would not have had the opportunity to attend but for her role as Custody Master. Rather, she was invited to attend and specifically asked to speak and respond to questions about the Revised Guidelines, solely by virtue of her professional role as Custody Master for County Court. *See App'x to Defendants' Mot. for Summ. J.*, ECF No. 96 ("[Plaintiff] was invited to attend… [Attendees] had questions for Master Tresslar… They wanted to understand the rationale behind the changes to these rules."). Her participation was thus an extension of her employment responsibilities, not an extension of private expression. *See Flora v. County of Luzerne*, 776 F.3d 169, 179 (3d Cir. 2015) (holding that speech was unprotected where it was "intimately related to the employee's job duties"). There is no other conclusion from the record than, had Plaintiff not been the Custody Master, she would not have been permitted to speak at the FLC Meeting. Employees do not speak as citizens when the mode and manner of their speech are possible only as an ordinary corollary to their government employment. *De Ritis*, 861 F.3d at 454-55 (3d Cir. 2017). Here, Plaintiff only had the opportunity to attend, speak, and field questions about the Revised Guidelines because of her employment. Absent her employment with County Court, she would have lacked both the access and authority to do so.

Moreover, the subject matter of her speech drew directly on special knowledge and experience she possessed as a result of her work, and she spoke from that institutional vantage

point. *See App'x to Defendants' Mot. for Summ. J.*, ECF No. 96 (Plaintiff was invited to attend because attendees "wanted to understand the rationale behind the changes to these rules…"). The Court also relies on the fact that FLC President Kruzel thought it would be productive if Plaintiff did not attend a prior FLC meeting because she believed that members would be more candid without a representative from the County Court present. *See App'x to Defendants' Mot. for Summ. J.*, ECF No. 96 ("I believe that I… thought maybe that members would speak more freely if she was not present, and so I said that, you know, I thought perhaps, you know, certainly she could attend if she wanted to, but that I thought that many people would be more forthcoming if she was not sitting right there."). *See also* Def. Mot. for Summ. J. at 15. This determination by the FLC as to which meetings would benefit by either the absence or presence of the County Court's Custody Master further underscores that Plaintiff's attendance and speech before the FLC were tied to her official duties. Under these circumstances, Plaintiff was acting in her official capacity as Custody Master and her speech therefore falls outside the scope of constitutional protection.

Even assuming, *arguendo*, that Plaintiff's speech was protected, her argument that Defendant's causation defense disregards direct and circumstantial evidence that a jury could credit is misplaced. The Court may accept such evidence if the speech were protected, but because it is not, Plaintiff's claims fail as a matter of law. It is not either/or, it is both. Likewise, her assertion that the chronology of events fits the retaliatory causation timeline recognized by the Third Circuit is of no moment. Questions regarding causation and Defendant's knowledge of the speech need not be addressed because the threshold issue of whether Plaintiff's speech was protected is dispositive.

### c. Plaintiff's Comments to the Judicial Conduct Board

In July 2022, a Judicial Conduct Board ("JCB") investigator interviewed Plaintiff. Defendants argue that Plaintiff's statements here are unprotected because the interview occurred

at work and drew on her professional knowledge. Plaintiff, on the other hand, argues that speaking to the JCB about judicial misconduct and child safety concerns was outside her role as Custody Master. The Court disagrees. Absent her position as Custody Master, she would not have had the same avenue or authority to engage with the JCB.

Plaintiff's statements during her interview with the JCB provide an additional, independent basis for concluding that she did not speak as a private citizen. The interview occurred at Plaintiff's workplace, during work hours, and her speech arose directly from Plaintiff's role as an employee of County Court. Plaintiff's statements during the interview were based on her role as Custody Master, not on personal views offered as a private citizen. *See App'x to Defendants' Mot. for Summ. J.*, ECF No. 96 ("So, with this interview with the [investigator], from the Judicial Conduct Board, you kind of expressed the same things that you've expressed to Judge Morganelli… Uh huh… The things that, kind of, you were privy to and very knowledgeable about as the Custody Master?... Yes."). These circumstances strongly indicate that Plaintiff was speaking pursuant to her professional duties.

Even if Plaintiff's statements during the interview constituted protected speech (which they do not), her retaliation claim based on this episode of speech independently fails for lack of causation. "[F]or protected conduct [or speech] to be a… factor in a decision, the decisionmakers must be aware of the protected conduct." *Eskridge v. Phila. Hous. Auth.*, 772 Fed. App'x 296, 299 (3d Cir. 2018) (*quoting Ambrose v. Township of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002)). Said otherwise, Plaintiff cannot prove retaliation for speech without evidence indicating that Defendants knew the speech took place. Here, Plaintiff has produced no evidence that either Defendant was aware of her interview statements at the time of the alleged adverse employment action. Where there is insufficient evidence to show Defendants heard or even knew about these allegedly protected statements, a reasonable juror could not conclude that Plaintiffs' speech to

the JCB was a substantial and motivating factor for the alleged retaliatory actions. Absent knowledge of speech, Defendants could not have retaliated against Plaintiff for it. Indeed, the undisputed record reflects that the JCB's rules prohibit disclosure of interview contents, and Plaintiff offers no evidence that those rules were violated or that her statements were otherwise communicated to Defendants. For example, when asked whether Judge Sletvold had ever received information that Plaintiff had participated in the interview, Plaintiff stated, "I doubt it… I think the Judicial Conduct Board is required to keep it confidential if someone complains." Speculation that Defendants may have learned of her speech to the JCB is insufficient to create a genuine issue of material fact at this stage.

## VI.    CONCLUSION

With the record as our guide, Plaintiff has failed to establish, through facts or appropriate inferences, that she engaged in protected speech or was retaliated against for doing so. Plaintiff further failed to show that Defendants were aware of such speech or that it was a substantial or motivating factor in any alleged adverse employment action.[3] Accordingly, Defendants' Motion for Summary Judgment (ECF No. 95) is **GRANTED**. An appropriate Order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge

---

[3] Notable is Defendants' flagging of Plaintiff's shifting argument during the course of this litigation. Reply Brief in Support of Defendants' Mot. for Summ. J., ECF No. 109.